We'll hear argument first this morning in Case 14-1504, Wittman v. Personhuballah. Mr. Carver. Mr. Chief Justice, and may it please the Court, the sum total of the alleged Shaw violation here is that the legislature treated black-majority district three the same way as it treated the ten-majority white districts. It's undisputed that with respect to all of those districts, they preserved the cores of the districts, Is that undisputed? How did they preserve the core when they shifted something like 180,000 people around? Right. Your Honor, 83 percent of the prior occupants of District 3 were in the core. The plaintiff's alternative only had 69,000. Anybody who spent a minute doing redistricting knows that simply because they're 63,000 short, that doesn't mean you're going to move anywhere near 63,000, if I may explain. For example, District 11 in Virginia was 64,000 short. They moved 480,000 people to fill that up. The district directly adjacent to District 3 was District 2. Was there any holding that that preserved the core? Yes. I mean, obviously, they said that core preservation was the most important interpretation. The district court found that incumbency protection and politics were inarguably motivating the district, because the way they were protecting incumbents was through core preservation. And the key problem here is they never found that race subordinated incumbency protection or politics, or that it was in any way inconsistent with that. But how can we take politics when the drafter of the plan, by rightly or wrongly, the drafter of the plan represented to the court. I haven't looked at partisan performance. It was not one of the factors I considered in drawing distance. And we have to take that. That's what the drafter of the plan said. He didn't take into account partisan performance. He said he didn't look at partisan performance statistics. In the face of that statement, the court found as a fact that politics inarguably motivated these districts. Every incumbent was reelected in the district. Suppose politics motivates the change in district. That is our objective. That is what we seek to do, to preserve incumbency or whatever. Right. May we then use race to move people from one district to another, because that's the easiest way to do it. We know that this is a race that votes strongly for a particular party. So we can use race for this ultimate neutral purpose. You can't use race as a proxy, Justice Kennedy. And it's very important to note that they didn't find — Just to be clear, because I understood your argument to be that. No. So perhaps you can correct me. It's the difference between Cromartie 2 and using race as a proxy. Cromartie 2 tells the Federal Judiciary you can't use politics as a proxy for race. Here, when it's conceded by the plaintiffs that everything we did made perfect sense, if everybody in District 3 was white, we know that they wouldn't have led to a dramatic exodus of Democratic voters into the four adjacent districts, all of which had Republican incumbents, if all of those people were white. And therefore, since they were pursuing exactly the same incumbency protection and political motivation with respect to District 3, they are not somehow disabled from doing that, simply because the predominantly Democratic voters happen to be black. That is why Cromartie 2 insisted that plaintiffs show, that traditional districting principles were subordinated to race rather than politics. How do you show what the motive of the legislature was? Let's say you have 10 percent of the legislators say this is because of race. That's their motive. Ten percent say it's because of partisanship. And 80 percent say nothing at all. What is the motive of that legislature? Right. I think it's very difficult to discern motive in a multi-member legislative body, which is why this Court has always looked, for example, in Cromartie 2, what are the effects. If, for example, there was a way of achieving the political objectives without respect to the racial composition of the enacted district, then it should be simple as pie for plaintiffs to come in with an alternative that doesn't rely on race, that achieves their legitimate political objectives. And yet plaintiffs in the district court here approve that any re-alteration of District 3, which results in the diminution of the black voting age population, would be absolutely contrary to the normal political agenda that would be motivating a legislature if everybody involved was white. The plaintiff's alternative only reduced the BVAP by 3 percent to 50 percent. And yet that converted District 2 with a brand-new Republican incumbent from a toss-up district to what plaintiffs themselves characterize as a heavily Democratic district. The Court's remedy demonstrates that the reduction was to 45 percent. And what did that do? It dismantled entirely District 3 and District 4. It took away about half the districts. But it made District 3 more compact. The only way to make it more compact is to split the district in half. That was the point we were making. Well, this district was never compact to start with. Well. I mean, it's contiguous only by water, not by land. Well. And it runs a very unusual route. It's certainly reasonably compact within the meaning of the Supreme Court, Virginia Supreme Court's definition of compactness, where you have to look at whether or not they're preserving the core of the existing district to assess compactness. The new plan splits less districts. All of these plans have their flaws. But the new one at least splits less districts and is more compact under traditional criteria. That is only half accurate, Justice Sotomayor. It splits just as many political boundaries, county lines, as ours does, 14. That's what Special Master Grofman said in his report. It is more compact, but I want to reemphasize, the only way to make it more compact is to split District 3 in half and to split District 4 in half. And what happens when you do that? It puts Representative Forbes in a 60 percent Democratic district, and he loses half of his incumbency advantage. Worse still, the avowed purpose of splitting them in half was to create two black opportunity districts. So it's actually more race conscious than what the legislature did. Would you spend a few minutes on whether this case is moot or not? As I understand it, the vast majority of the districts of the representatives who are parties to this action have not been changed in any meaningful way. Forbes is the only one who had perhaps a live claim, but he's decided to run in another district. So how do we have a live claim or controversy? Oh, because what they did to Representative Forbes was to severely hamper and indeed make impossible his change. But he's decided not to run. Right. And that means the injury is so severe that it forced him out of the district. Let's assume you had paired two Republican incumbents. Is he going to go back and run in the old district? But for the remedial order, he would obviously be running in District 4. That's where he lives. That's where he's a 16-year incumbent, and that's where he's got a huge incumbency advantage. The fact that the injury that they imposed on him in District 4 was so severe, it pushed him out. Plaintiffs don't need to continue down what they were doing. This Court has found that the worst kind of injury is when the challenged act is toxic. Are you representing that if the math goes back to the enacted form, not the new one, that he will run in his old district? Absolutely. He will run in the district that he lives in, that he's been re-elected in for 16 years, and that he has a huge incumbency advantage. Rather than going to a new district where 100 percent of the voters will not be true. I'm sure this was undisputed. As to the old district, we do have a rule that District A is allegedly gerrymandered. Voters in District B can't challenge that. You have to be a voter in the district that's allegedly gerrymandered. So how is it that a voter in District 4 could not bring a challenge, but the representative of the voters in District 4 can? Because they're asserting a constitutional right. As this Court held in Hays, certainly these people in adjacent districts are injured. They're just not injured in a way that's cognizable under the 14th Amendment because their personal right to discrimination has not been invalidated. But we are defendants appealing an adverse order. Defendants appealing an adverse order never argue that the adverse order violates their constitutional rights. They're arguing that it disrupts the status quo by changing the rules, and the status quo is what they are defending. This Court has made it clear repeatedly in a SARCO, SWAN, electronic fittings, that obviously if the remedial order puts the defendants in a worse position than they were, they have a direct stake in the outcome of the appeal, and they can appeal. If the rule were otherwise, Justice Ginsburg, no defendant could ever appeal an adverse order because the adverse orders virtually never are alleged to violate their rights. So it's precisely the same sort of injury suffered by Representative Forbes as we would be suffered by an incumbent who lived in District 3. Let's assume the incumbent in District 3 had intervened, and they dropped the BVAP to 30% and made it a 60% Republican district. Is anyone arguing that that incumbent couldn't challenge the order that severely hampers his or her chances for re-election? The answer is clearly yes. Since Representative Forbes in the adjacent district has suffered precisely the same kind of injury as I hypothesized for the incumbent in District 3, by analogy to Hayes, obviously he has standing to appeal. What about Bratt? What about Bratt? I could argue, Your Honor, if I wanted to, that Bratt and Whitman, who were in 7 and 1, also had their districts changed in a way. But I must admit the palpable negative political consequences are de minimis compared to that suffered by Representative Forbes. So while I'm certainly not abandoning it, I have to face the reality, if you're not accepting my argument for Appellant Forbes, then 842, Your Honor, you won't accept it for Bratt and Whitman in 1 and 7. Normally, the defendant is the state in a voting rights case. They're the ones that have the plan. So someone attacks the plan. These are interveners because they were affected. The court said you could intervene. Now the state's gone. I'm looking for some kind of rule or some kind of workable standard such that a new plan that the court puts in would allow some people in other districts to remain to defend it, but not everybody. Or do you think everybody? I mean, after all, a plan in a smaller state that affects one district and makes changes likely affects people in every district, at least some of them. Some people will find it easier to get elected. Some harder. I haven't found a case that supports you, but you'll tell me which one. I will give you two. Okay, good. A SARCO articulates the burden in a non-election context, which is do you suffer a threat to your current injury because of the lower court opinion? And the best case is actually Meester v. Keene in applying that injury to hurting your chances for re-election, Meester v. Keene, where the court found that because they had attached the propaganda label to this California Democratic legislator's acid rain documentary that hurt his chances for re-election. The Solicitor General says, well, it's used the word reputation. That's true.  If you look, Justice Breyer, carefully at the case, you'll see there's not a scintilla of evidence suggesting that his reputation was harmed. And after all – sorry. And the distinction between, let's say, the best one is the split district, the one you were just talking about, Representative Ford. If he has standing, who doesn't? Well, the standard is Meester v. Keene. And this was the argument that this California Democratic legislator running an acid rain documentary said. He said he's hurt for re-election because Ed Meese and the Reagan Justice Department labeled it propaganda. That's not a severe harm. But, I mean, in the voting context, the standard for saying that a person in another district is hurt enough to be able to maintain standing here, and these people aren't. Which ones are and which ones aren't? Meese used the formulation harm his chances for re-election. You can attack harm his chances for re-election. But, Justice Breyer, this is the simplest possible case. Use whatever adjective you want before harm. Substantial, significant. They turned a district that he had easily won for 16 straight years into a 60 percent Democratic district, which no Republican has ever won. Justice Sotomayor? We announce a rule that every change that affects an incumbent gives the incumbent the right to challenge their blind. I think any time somebody's injured in fact. Just answer the question, yes. This is now an incumbency protection standing rule. Every time your district is changed and you believe it hurts you, you have a right to go to court and say what? I want to quibble a bit with the premise, Justice. It's not that you believe it hurts you. It's that it's undisputed that it hurts you. It all of a sudden shows. That's the rule. Do you have a right to claim? It's one thing to say I'm a voter and I've been racially discriminated against. What is the incumbent claiming? It's not racial discrimination against. That the remedial order has hurt dramatically, indeed irretrievably, his chances for re-election. So, Mr. Garber, let's assume that that's true and that that counts as an injury in fact. We also have this other requirement in the law, which we talk about a lot less, but it seems to be quite well established, which is that there needs to be a kind of legally recognized interest. So it's not just that you have to have an injury in fact, although you have to have that, but that there needs to be an injury to a legally recognized interest. So what is the legally recognized interest here that the legislators are banking on? He wants to be elected. No, that's a, you know, he wants to be elected. He's been injured in fact in the kind of practical ways we can all understand the injury. But this other part of the test really suggests that you need a kind of legal recognition of your claim. And that's what I'm searching for here. Well, two points. You don't, you surely don't need to show any cognizable right. Nobody's arguing that they have a right to these districts. If, again, appealing defendants had to show a legally cognizable right, then nobody would be able to appeal because they're never arguing that the adverse judgment deprived them a legal right. Are you saying that that part of our standing doctrine, which does look as to whether there's a legally cognizable right, is only good for plaintiffs, and that once the inquiry shifts to the defendant, it just completely drops out of the picture? It just recognizes the reality of the difference between a plaintiff filing a complaint challenging the state law and a defendant who's defending the state law, who's obviously not going to argue that his legal rights have been violated. He has the same interest as the people who are supposed to be defending the state law, which is he was well-benefited under the status quo ante, and he has suffered direct injury in fact because of the alteration caused by the remedial order. And the notion that... Justice Kagan can ask her own question, but he suffered injury in fact to what? To his ability to be re-elected. The same injury in fact that was recognized in Meese v. Keene, Davis v. FEC, and a host of cases like Storer... A legally recognized interest in being re-elected without improper interference or something like that. Not having a state entity, in this case a federal entity, affirmatively intervene, override the sovereign prerogatives of the state, and create an electoral system which substantially diminishes, indeed eliminates, his chances for election. Why is that not injury in fact? It was injury in fact every time this Court says... I wasn't contesting the injury in fact requirements. I think I was asking about, and it really is a question, how this other separate requirement, which is that the invasion has to be to a legally protected interest, applies in the context of a defendant. And you're just suggesting it drops out entirely. And I guess I'm suggesting, I mean I might be right, but it seems odd that a plaintiff would have to show it and a defendant, it just disappears from the inquiry. May I clarify? They need to show a legally cognizable interest. What they don't have to show, unlike a plaintiff, is that legally cognizable interest is a protected constitutional or statutory right. Would they have a legally... So the legally cognizable interest is, just finish the sentence for me. That he has been injured in fact and has a direct stake in the outcome because he wants to be re-elected. That just makes the legally cognizable interest the same as the injury in fact requirement. Fair enough. Sorry, go ahead. I apologize, but I do want to eliminate any confusion with Justice Kagan. Here's the point. Why would, of all the harms in American society, harms to re-election not be legally cognizable? As the Solicitor General points out, the point of standing is to keep the Federal judiciary in its properly limited role in democracy. If two unelected judges have falsely altered the State sovereign's views of redistricting, that would be the situation where we would want to find the injury most cognizable because that is where the Court exercises extraordinary caution and extraordinary ability. I apologize. There's two questions. There's the question of injury in fact, which you've been talking about. Now on the issue of legally cognizable interest, does a member of Congress who wants to be re-elected have a legally cognizable interest in running in a district that was lawfully enacted by the State legislature? Yes, he certainly does because obviously the interference, and you have to accept this true for standing purposes, the improper interference of the Federal judiciary into that political thicket which harms him and rearranges the entire district is obviously injury in fact and is just the kind of interest that this Court would want to find cognizable because after all, it's most concerned about the Federal judiciary hijacking the political process much more than in any other case. Here is the basic problem. I can't get the right analysis. Look, normally a plaintiff is suing because somebody did something to him. So the defendant is the person who did it and normally we're looking for the standing of the plaintiff and there are all kinds of rules there. The person who did this to the plaintiff is the State. They're not in it anymore. So of course the difficulty comes from the fact that the congressmen aren't the people who did it. I mean, these particular people aren't the ones who did it, but they're still in the case. It's rather like Smith sues Jones for a nuisance. There's an order entered. It is an injunction. Jones's neighbor, Brown, says this injunction is hurting me. Now does Brown have standing? And at that point we're into a new kind of a case and I'm sure there's law on it. And I just haven't got the right things yet. And these cases, they'll have the language, you say. I'm just not certain of the way to analyze it. I've given you a circle. I've given you means. Let's talk about incumbency protection generally. If they had paired two incumbents. This Court found in Carcher v. Daggett, Justice Brennan said, that kind of political gerrymandering imposes such a severe injury, you can adjust equal population. In Larios, where this Court summarily affirmed, they said that kind of injury is a classic tool of political gerrymandering. Is it conceivable that paired incumbents would have no standing to challenge the fact that a court has put them in the same district? Your Honor has recognized that incumbency protection is one of the neutral districting principles, no different than compactness or anything else, which gives incumbents special factual distinctions from the run-of-the-mill people. In Term Limits v. Thornton, this Court held that it was unconstitutional to make it more difficult for incumbents to be re-elected because they had to engage in mailing campaigns rather than be on the ballot. So we are talking about a well-recognized constitutional right where incumbents are not similarly situated to average voters and do have very different factual interests. If it is undisputed as it is that the sole reason that Representative Forbes is now facing doom in District 4 is because of this order, I can't understand any reason why the Court would sit back and allow the federal judiciary to hijack the most intensely partisan kind of litigation we have. Mr. Carvin, can I take you back to the merits? Let me give you a hypothetical. It's not this case. It's a different case. Okay. Let's say that there are some racist map drawers. And they say, here's what we're going to do. We're going to set districts, and we really want to segregate African-Americans. And so they say that's our first aim. But we also have a second aim. It turns out that African-Americans vote in a particular way, and so our second aim is that we are going to achieve some kind of partisan advantage as a result of this segregation. Now, what should be the right answer to that question? Is there strict scrutiny in such a case? I give precisely the answer this Court gave in Alabama, where they had an absolute BVAP floor, which you could argue was trying to segregate the race. This Court didn't say that ipso facto invalidated all 35 majority-minority districts in Alabama. It didn't, as this District Court said, go dismantle all 35. It said, did that racial purpose have some kind of effect on the... You're making my hypothetical more complicated than it is. We're just... This is one district. We're just going to segregate all the African-American voters in this district. We're doing that primarily because of racial reasons. We don't like African-American voters, and we're just going to keep them all in one district. And secondarily, that has politically beneficial consequences for us. And so the question is, is that unconstitutional? Because, you know, if I look at that, I say, okay, race was your primary motivation. That triggers strict scrutiny. You fail strict scrutiny. You're out of the ballgame. But you suggest that you're not out of the ballgame because you have the secondary interest, which coincides with the clearly racist conduct. And that's the question that I want you to answer. If it coincides and if it is a motivating factor like it was here, then obviously you need to show that race was the but-for cause of any alteration of district lines. You need to show that it subordinated the neutral principle, and you need to show, to quote Alabama, that it had an effect on district lines.  Because in my hypothetical, both of these things run together. They're not in conflict with each other. So you're saying the critical question is not conflict. I had thought that you thought that the critical question was conflict. Rather, the critical question is, which is the primary motivation or which is the but-for purpose and which is the secondary motivation, even if both run in line with each other? That's a different kind of test. I'm happy to clarify, Justice Kagan. If they're completely coextensive, if, as here, the only way to accomplish your incumbency protection in political purposes was by doing where race predominated, then obviously it can't be the but-for cause. It's very clear, just as it is in this case, I have to say. They have a list of criteria, and number one on the list is race. And then we have a lot of direct evidence in my hypothetical that this is for the most heinous racial purposes imaginable. And the question is, does the fact that it also has political benefits, does that insulate these line draws from what you would think is the obvious conclusion, which is this is unconstitutional conduct. In every context, Mount Healthy, Gross, even outside of the Shaw cases, where plaintiffs have a special burden to show as race rather than politics, even in those cases, you need to show that the impermissible factor was the but-for cause of the challenge action. Well, he says this is our first priority. Yes, and every legislature and every court in the United States has ranked the Voting Rights Act higher than other things because they all recognize the supremacy clause. In my hypothetical, it's his first priority because he's a racist line drawer. Great. Let's assume that he picked 55 percent BVAP out of the air and just wanted to make that his top priority. Does that have an effect on any district line? If it is undisputed and clear as it is here that they would have drawn the district precisely the same way to protect incumbents and politics, that if you diminish below that BVAP floor even to 50 percent, we know for a certainty because plaintiffs have proved it to us that that would... That sounds to me as though it's a harmless error rule for racial discrimination. We've never had a harmless error rule for racial discrimination. What we've said is, look, we just found a racially discriminatory purpose. End of case. What you found in Cromartie, it's not harmless error. It's you need to show but-for causation or effect, as they said in Alabama. Cromartie held as a matter of law the fact that there was racial percentages, lack of compactness, and breaking of county lines is insufficient as a matter of law to find a violation. Why? Because there's an equally plausible explanation, which is politics. And it is the plaintiff's demanding burden to prove race rather than politics. Could I ask a question, which is really highlighted by Justice Kagan's hypothetical? Because normally were it not for the Voting Rights Act, there would be a very simple answer to all of these questions, and that is that you cannot take race into account at all. It's invidious discrimination to take governmental action on the basis of race. Does Shelby County have any relevance to this case? Is this the type of case that will never come up again in the future if the Voting Rights Act is not amended? Right. You need not worry about this in 2022, but the issue here, Justice Alito, is what was the reality confronting the legislature in 2012. And they had to get preclearance by the Justice Department in record time, so they needed to get very quick preclearance, which is why it made eminently good sense not to go below the benchmark VDAP. But even if we assume, to get back to Justice Kagan's question, that they just plucked 53 percent out of the air, it still doesn't establish a violation because this Court has said countless times race is always a factor in redistricting. So it's not like employment in another context. And here's what the Court said in Cromartie 2, and the lower court completely defied. It said, in a case such as this one, where majority-minority districts are at issue and where racial identification correlates highly with political affiliation, the party attacking the legislative drawn boundaries must show at least that the legislature could have accomplished its legitimate political objective in a different way. The first seven words of that quote are, in a case such as this one. And the question is, what did they mean by that? And one understanding of what they meant when they said, in a case such as this one, is in a case in which there was no direct evidence of racial motivation but only circumstantial evidence, and the absence or the presence of a map was indeed relevant to the question of whether that circumstantial evidence added up to the conclusion that race was the motivator. I must respectfully disagree that that's a remotely plausible interpretation of this language. In a case such as this one, comma, where majority-minority districts are at issue and where racial identification correlates highly with political affiliation, was somehow sending some implicit signal that what we meant was — No, it's just in a case such as this one, the case before us. No, it's the beginning — Well, why didn't we ask for a map in Alabama? Why didn't we — the court said, remand to find out which districts were affected by the BVAP law. Under this theory, all 35 districts in Alabama, all majority-black districts, are ipso facto violations of Shaw. And by the way, every majority-minority district in the country is ipso facto violative of Shaw because every legislature and every court that has created one has invoked the supremacy of the Voting Rights Act. But that's not what the court did. The court said, go back and figure out if race had some significant effect on the lines. It didn't say, go turn all majority-black districts into 45 percent black districts, and that would be the great evil of accepting this tautological rule. That is why the court has been so insistent on showing that race rather than politics did it, particularly in states like Virginia, where race and politics are so coextensive. Without further questions, I'll conclude. Thank you, Counsel. Mr. Raphael. Mr. Chief Justice, and may it please the Court, the district court did not commit clear error in concluding that race predominated in the redistricting, triggering strict scrutiny because ample evidence supported the district court's finding that there was a 55 percent BVAP floor that was used to move more than 44,000 African-American voters into CD3. It didn't commit clear error, but you thought it committed error, right, given the prior position? Our office, Your Honor, our office defended this district at trial. We thought that there was conflicting evidence about whether race or politics predominated, and the district court resolved those factual issues against us. And because of the clear error standard, we chose not to. No, I understand. But your position, if you were taking a considered position at trial, is that the district court was wrong because that was you presented the facts and you defended those facts under your view, and then on appeal, they overturned it, and you say, okay, they were wrong, but not clearly wrong. I mean, there's nothing wrong with that. I just want to make sure. That's exactly right. And that's why we didn't appeal. But the evidence supporting the district court's finding was amply sufficient under the clear error standard. It included the sworn expert report, frankly, by our own expert that conceded that there was a 55 percent floor. That's page 518 of the Joint Appendix. Did anything else happen between the time when your office took the prior position and your appearance here today? You may be referring to Judge Payne's surmise that because of a change in administration Well, I'm just asking you, is there anything relevant that happened? Your Honor, our administration came into power in January of 2014. The case was pending on summary judgment.  We defended it at trial. The same career attorney argued it at trial. When the district court ruled against Virginia, we had to evaluate whether we could win on a clear error standard and concluded we could not. In addition to our own expert's sworn report that said that there was a 55 percent floor, Virginia's Section 5 submission referred to a 55 percent threshold as well. That's page 77 to 79 of the Joint Appendix. Which expert are you talking about? John Morgan, Your Honor, page 518 of the Joint Appendix. You'll see his sworn report where he refers to a 55 percent floor that was used in the House of Delegates redistricting. He actually served as a consultant to the Republicans in the House of Delegates and served as an expert here. It was also one of your experts that said that if every person involved in these swaps were white, the results would still be the same, right? Well, Mr. Morgan, Mr. McDonnell, John McDonnell was the plaintiff's expert. He was asked, can't a lot of these swaps be explained based on politics? And he said they could be, with the exception, I would say, of Plaintiff's Exhibit 57, which showed that there were five. That's page 439 of the Joint Appendix. And it showed that there were five voting districts that were dropped from the benchmark district, which had above 55 percent performing democratic performance, but they were very low in DVAP. And I think that that evidence supports his argument. Would there be a violation here if the district that were drawn could be explained on the basis of partisanship rather than race? If the only evidence were statistical, just like an Easley versus Cromartie, and it could equally be explained based on partisanship, you're right. I think we would have won the case and we'd be defending that position here. But I think what really killed us was the Morgan, our own expert's report that said that there was a 55 percent floor. There was other evidence that there was a floor. The district court did not commit clear error in finding that that was the driving factor here. It's a question I asked Mr. Carvin. You're talking about the motive of the legislature, right? What do you do when it's 10 percent race, 10 percent partisanship? And it is often the case, I suspect, 80 percent of them don't say anything at all. Right. It would be a lot harder if you had that kind of case here. But in this case, there was one sponsor. He said that the BVAP had to be at least the same in the new district as in the benchmark district. He said that twice. And then he said in order to have certainty of preclearance, we need to bump it up to 55 percent. But if you're a legislature and you say, okay, I understand that. You say, but I suspect most of them looked at the map and said, you know, how am I doing here? What's the percentage of Republican? What's the percentage of Democrat? What's the change? They may not have cared what the sponsor thought about it. Yeah. I think there may be two ways to look at the evidence in this case. There's a way that the district court did, which was to say there was a 55 percent floor. Did politics trump that? No, because as Justice Ginsburg pointed out, the sponsor said, I didn't do a partisan analysis. That wasn't a factor. And so on that scenario, the district court didn't commit clear error in saying there was a floor. It triggered strict scrutiny. Politics didn't control. That's a simple case. The harder case is the one that you're describing, where, you know, people might look at this and say, well, I'm not going to be a Republican, so I'm going to quietly go along with it. But in that instance, race would be used as the proxy for justifying the plan. And I don't think race can be used as a proxy, to Justice Kennedy's point, nor can it be used as the excuse. And that's how it was used here. The other evidence included statements by the members of the House and Senate in the House of Delegates redistricting at page 533 and 527. There really appears to have been a mantra, this has to be at least 55 percent performing. Senator Vogel said that, and she's an election lawyer. She said the lowest the DOJ will preclear is 55 percent. That's page 533 of the Joint Appendix. And then Janice's statement that the most important factor to him was obtaining preclearance. And it actually would be ---- Was there a basis for the legislator who said the Department of Justice won't accept it if we go below 55 percent? Was it something she made up? Or did she have some basis for that? The record in this case has no showing as to where that 55 percent number came from. In fact, the record shows that this exact district was precleared previously at 53 percent and at 50 percent. The Senate, Virginia Senate districts were precleared at 50 percent. Are there districts in other states or in other cases where the VVAP is 55 percent or 60 percent? Or is that unusually high? I don't know the answer to that question. The record shows that DOJ precleared a district as low as 33 percent. That's at page 205 of the Joint Appendix. That was in South Carolina. And I agree with Mr. Carbon that it's not enough to say that we're complying with the VRA and that that triggers strict scrutiny. I don't think it does. But when you say we've got to comply with the VRA and the way we do that is by having a 55 percent floor, then I think the trial court got that right and that does trigger strict scrutiny. Once we lost the issue of race predominating, that was the end of the case for us because we didn't put any evidence, and Mr. Carbon put no evidence in to justify narrow tailoring as to where that number comes from. It simply wasn't there. The Congressman Scott had been elected by huge margins, 70 percent before this plan was altered. After it, he was elected by a margin of 81 percent. And our own defense witness said he wasn't offering evidence on narrow tailoring. That was the end of the case on the merits. I would like to address the standing issue briefly. It's not in Virginia's interest or in any State's interest for an officious intermeddler to prolong litigation like what's happening here. But we looked at the law in Meese v. Keene, and we read that as standing for the proposition that where an intervener can argue an injury to his election opportunity, that is adequate for a standing. And in this case, it's true. Congressman Forbes, the fact that he had to switch from CD4 to CD2 really does prove the injury. And the special master found that his district would go from 48 percent Democratic to 60 percent Democratic. I think that that suffices to prove the injury. Meese was the case, wasn't it? Was that the case involving the California Senator? A lobbyist? That was the California Senator who wanted to show a Canadian film that was dubbed political propaganda. Yeah, yeah, political propaganda. Okay. It's a harmed reputation. I see that. If, in fact, this is a sufficient injury, the injury that now the plan will make it harder for me to be elected, that should give rise to a claim by virtually every member of the state legislature. And indeed, if it gives rise to their claim in their hands, why not in the voters' hands? You have in a state like Virginia several million people who could attack any redistricting plan and any variation on any redistricting plan. That's quite a lot to read into Meese. Justice Frey, I don't think it means that. Forbes has a special justification because he clearly goes from a safe seat to a seat he's probably going to lose, and that's why he switched. Special because it's more severe in degree. Yes. I think normal Article III jurisprudence explains this. Others, like Wittman's, for example. There is no case that the closest you can come is the case of a lobbyist who is complaining about his reputation. She wasn't a lobbyist. She was a state senator running for reelection. And I think that case is controlling. But is there anything better? I think that's the best case. Take a look at footnote 8 of the brief that the government filed on that case. The government argued in Meese v. Keene, damage to reputation isn't — damage to candidacy isn't enough because it depends on the actions of voters and third parties. This — not one justice dissented from the holding in Meese v. Keene that injury to candidacy was an adequate Article III injury. And as I mentioned earlier, Justice Alito's opinion for the court in Clapper referred to Meese as standing for the proposition that it was an impairment of political career. So we read that case. We looked at what the government said. We think it gives them standing. Are we happy about it? Not — no. We don't want officious intermediaries to prolong litigation. And maybe they'll be responsible for the state's attorney's fees if we have to pay the plaintiff's attorney's fees. But they — we think they do have standing to maintain this. Do you think it's fair to characterize Forbes as an officious intermediary? Well, I don't mean to disparage him in any way. He obviously is — The future of his political career that he's had for 16 years. That's exactly right. And that's why I think he has standing and why the court should affirm on the merits. Thank you, counsel. Mr. Elias? Mr. Chief Justice, and may it please the court, the state of Virginia has twice decided not to appeal the decision below. This court has said in several occasions, and most recently in Hollingsworth, that it has never upheld standing of a private party to defend the constitutionality of a state statute where the state itself has not chosen to do so. This is not the first time that the court should venture into this new ground. The fact is that in — under the American system, voters choose candidates. They choose their elected officials. It is not the other way around. I listened intently to the arguments of counsel, and the fact is, this is not a question of what they did to Mr. Forbes. It's a question of what the state of Virginia did to the voters throughout the Commonwealth, including in the 3rd Congressional District, the 2nd, and the 4th. Candidates win and lose elections for all types of reasons. It is not true that it is conceded, that partisan performance is the be-all, end-all of why one wins or loses an election. In fact, the lead plaintiff and the lead intervener in this case initially was Congressman Cantor. Well, I don't want to impugn in any respect the motives of the Commonwealth of Virginia, but if it were the case that a state decided not to defend the Constitution, not to defend the legality of a districting plan that was adopted by the legislature, and that decision was made purely for partisan reasons, you would say that a member of the — that an elected official or a candidate who was severely, adversely affected by that should not be able to challenge it? That is correct, Your Honor. Not every injury in our society opens up the courthouse door. There are — as the colloquy earlier discussed, there has to be a legally protected interest. And members of Congress do not have a legally protected interest to choose their voters. What if the decision — and again, this is not — I'm not saying this about Virginia in this case, but what if it were the case that that decision was made for a racist reason? I'm sorry, I'm not — What if it were made for a racist reason? What if the reason for not defending the legality of the districting plan was a racist reason on the part of the state executive? You would say that an adversely affected member of Congress or a candidate would not have standing. That is correct, Your Honor, because members of Congress simply don't have a legal interest in choosing their voters. It's worth looking at the supplemental briefing and the briefing on standing in this case to illustrate why the injury here is not just not legally protected, but is entirely speculative. The state of Virginia in their initial brief when we were asked to brief the question of standing said that there was no particular congressman that had standing at that time, but that one may soon reveal themselves. Seven days later, they filed a brief saying they've now revealed themselves and the member with standing is Congressman Ridgell, because it looks like Congressman Ridgell's district is going to be affected. A month later, the state of Virginia said, okay, it's not Congressman Ridgell. It's Congressman Forbes. This court has said one needs to have standing at every stage in the proceeding. These plaintiffs needed — I'm sorry, these appellants needed standing at the moment they filed their appeal and at every stage thereafter. If the state had a plan designed to protect incumbency and it did not do that, could a voter object to the fact that the incumbency rationale was not followed? So — Can voters assert an interest in preserving incumbency? So two answers, Your Honor. Number one is I don't believe an individual voter would have anything more than a general grievance. Number two, it's worth noting — So then you have an acknowledged interest on the part of the legislature, but the fact that the plan fails to accomplish that, no one can object? Well, it is interesting that in this case, neither the Virginia State House nor the Virginia State Senate, both of whom are controlled by the same party as the members of Congress affected, neither body nor the legislature as a whole has chosen to intervene in this case, which is quite different than, for example, in the Arizona case that this Court handled — resolved where it found that — Under your view, could the legislature as a whole intervene? I think that the legislature could have intervened and would have a better claim to standing, again, under the Arizona redistricting case that this Court decided. The legislature who passes the law has greater standing than the individual who's affected by the law? Well, we are all affected by the law. I say we because I live in the Commonwealth. All Virginia voters are affected by the law. And members of Congress have to do — the appellants in this case have to do better than that. They can't just say they're affected by the law. They have to show why they have a legally protected interest, as Justice Kagan said. It sounds to me like it's incumbency, which is the very thing you say that this one individual cannot protect. Well, why can't a legislature — a whole legislature assert it, but not one? I don't understand. So, Your Honor, one thing I want to clarify just from the record. It is not the case that we have conceded, nor is it the case that the Court found, nor are the underlying facts the case, that the Virginia legislature endeavored to protect incumbents. What Mr. Janis said was quite specific. He did not want to pair incumbents. He did not want to draw their houses out of their districts. That is quite different than saying that the Virginia legislature had a policy of protecting incumbents. In fact, the only way to protect incumbents would have been to use partisan data or race as a proxy for partisan data, the second of which would be unconstitutional. Race — you say race as a proxy. If — and this is why Easley, I think, is so important. The way you check is to come up with a district that would achieve the same partisan objectives without respect to race. And you weren't put to that test in this case. Well, Your Honor, I think that that is true in the circumstances in a case such as Cromartie, where the evidence, the direct evidence that race predominated was quite weak. In fact, arguably the direct evidence went the other way. It suggested that politics was what drove the map. And the court was evaluating what do you do in a circumstance where there is no direct evidence that race predominated, but you have circumstantial evidence that maybe it did, maybe it didn't. And in that case, one way to tease out whether it was partisanship or race is to say, okay, show me the map that teases that out. In this case, we have no need to tease it out. Well, I mean, it makes it, I guess, you have a greater degree of confidence if you have an alternative that said, look, if they wanted partisanship, which is usually a pretty high priority for politicians, if they wanted partisanship, they would have done this, but instead they did this. But if you're not forced to show that, then you have reliance on however many quotes you can find. And I get back to the question I asked before. How do you analyze it if it's 10 percent race, 10 percent partisanship, and 80 percent who say nothing at all? So in this case, Your Honor, just as a factual matter, it was the person who sponsored the bill, the person who drew the map. Is that Janice? Janice. He wasn't in the legislature when this was approved, was he? I believe he was. At the time that the map was approved, he was the sponsor of the bill. Well, I thought the person who drafted the plan, maybe I got that mixed up, it wasn't Janice, was not in the legislature. Well, Janice says that he, in fact, I believe said that he, in fact, drafted the plan. We may be talking about each other about the House, the Statehouse plan versus the congressional plan. But in any event, the fact is that if you look at Exhibit 57, which Mr. Rafael pointed to, what you see is that Professor McDonald did a very important calculation. What he looked at is the voters that were added and the voters that were taken out. And what he found is that the voters being added were much higher propensity, had a higher percentage of black voters than they were Democratic. So, in fact, he found, to use a colloquialism, he found the blackest parts of the voters, the voter pool, and added them and skipped over white Democratic voters instead. The differential was about two to one. So, in fact, there was an analysis that teased out based on statistics. So you could have, you think you could have drawn a map under Cromartie that would show if you wanted to protect incumbency and Republican or Democratic advantage, you would have done this, and instead you did this. I don't think that the question is whether we could have drawn a map. The question is whether or not Cromartie requires in a case where. Well, why isn't it the question where you could have drawn a map another way? Are you saying if you can draw a map only by using race, then you can't draw the map? Is that your position? I can see why you could take that position, but is that what you're saying? Yeah. Well, my position is that, as Mr. Raphael suggested, the analysis that was done involved a handful of VTDs, which are essentially precincts. So we could have potentially drawn, after that analysis, a district that made very few changes. But I don't think that that's what Cromartie had in mind. I think Cromartie had in mind a circumstance where you were not using race as a proxy and you are drawing a significantly different district that shows that race and that race predominated over partisanship, whereas in this case, the use of these VTDs was to try to get at something different, which was the intent of what Mr. Janus and the legislature had in mind. But let's not forget that there was, Counsel, I'm over here, you're skipping over it, and I'll bet the map might have been slightly different. It still was going to be different if you had not used race. That's the whole purpose of the exercise, correct? Correct. If you're race neutral, you move people not on the basis of their skin color, but on some neutral principle. And you have shown that in at least five precincts were moved where it wasn't on the basis of partisanship, it was on the basis of race. Yes, Your Honor. Well, but if you move those districts, then you'd have to move other districts to make up for it. And again, I think that's what Cromartie does. It says we don't have to speculate about 10 percent, 10 percent, 80 percent. What you have to show is that partisanship could not have been the factor because you couldn't have drawn it any differently without affecting partisanship. I think that our burden was to show that race predominated. And I don't think that Cromartie puts a straitjacket on Miller and Vera to say that the only way or Shaw, that the only way you can do that is through the alternative map. If race and partisanship are coextensive, which one predominates? Well, in a case where the legislature tells you. No, no. If race and partisanship are coextensive, then which one, you may say it's an abstract question. It isn't the same. It doesn't fit these facts. But if that's the case, which one predominates? If you had a circumstance where there was no other evidence other than these two factors, race and partisanship, then essentially it's a tie, then neither predominates over the other. And who loses if it's a tie? We would lose if it was a tie. But in this case, there is no tie. There's nothing even approaching a tie. The legislature set a 55 percent threshold. Suppose the legislature had kept the same number as what was referred to as the benchmark plan. Suppose instead of making it 56.3, they kept it at 53.1, kept it exactly the same as in the prior plan. Justice Ginsburg, if it was done as a mechanical threshold, then it would be subject to heightened scrutiny. The State would have to show that it had met that burden. Any time the State sorts people based on race in a using mechanical targets or thresholds in the redistricting context, then it has to show that there was a very good reason for doing so. Is that what you're making a ride on? Do you agree with the Solicitor General that a simple statement from the line drawers that they were trying the best they can to comply with the Voting Rights Act, that that is not sufficient to have strict scrutiny apply? So I think that this Court in Alabama made clear that the fact that the State of Virginia may have been under the mistaken belief, a good faith mistaken belief, that it had to go to 55 percent. Yes, no, I got that. I'm saying assume a different set of facts where they weren't just saying we have to stick at 53.1 or we have to go to 55 percent. Assume a different set of facts where line drawers simply say, of course, our first priority is to comply with the law. Do you think that that itself triggers strict scrutiny? No, of course not. That's the supremacy clause. So the fact that the State of Virginia understood it needed to comply with the Voting Rights Act does not in and of itself trigger strict scrutiny. So what you think triggers strict scrutiny is essentially the use of a mechanical target here. Correct. Correct. It's not related to the ability to elect. Correct. And, in fact, if you look at what Professor Bronfman did as the Court special master, you can see he did a very thoughtful analysis that weighed all of the traditional redistricting criteria and then looked at the impact that it would have on the ability of African Americans to elect a candidate of choice. And that is a model of the kind of analysis that the State of Virginia should have engaged in but didn't. Instead, it started with a 50. It said the district was 53.1. If we go under 53.1, we're breaking the law. Let's go to 55 because that gives us certainty rather than a lack of certainty. So 55 percent it is. Thank you, Counsel. Mr. Gershengorn. Mr. Chief Justice, and may it please the Court, I'd like to make two points on the merits, but I'd like to start where this Court is going to start with standing. We believe that appellants lack standing to appeal. Appellants allege that the district court's judgment may cause them harm by adding voters to the district of a different political party who may vote against them. But candidates have no legally cognizable interest in the particular composition of the voters in their district. Is that true when the legislature specifically has adopted incumbency protection as a matter of State law or a matter of State policy? So, Your Honor, I think if they had adopted as a matter of State law incumbency protection, that might be different because then the legislature would have established that actually as a legally cognizable right. But that is not what's at interest here. And if I could say, Your Honor, what's at issue here is whether a candidate has an interest in a particular composition of his voters. And we think actually Your Honor's own opinion in LULAC is quite instructive on this. What Your Honor said in LULAC, if you'll recall, is Congressman Bonilla had alleged or the allegation was that the Latino voters there were no longer voting for Congressman Bonilla. And that was why they redistricted. And what you — what your opinion for the Court said there was that that kind of voter protection, which is for the candidate and not for — not for the individual voter, is fine for the realm of politics, but it did not justify the — could not justify the action there to save it for Section 2. District 5 in the state, which is heavily African American. And so imagined racist legislatures changed the whole district so they couldn't possibly elect an African American. Does the African American member of Congress have standing to contest that? So a voter would have standing to contest it. A candidate would have standing to contest it if he or she were a voter in the district. I think under Hayes — But as a Congressman, not. As a Congressman, I think not. At least this Court has not said. But remember, what we have here is a quite different situation where you have a candidate — No, I know it's different. What I'm looking for throughout is I understand that there has been no case which discusses this that I've been able to fund. They have the Meese case, which is in a different context. But why is that different? And what's bothering me about it, which I don't want you to just say I'm right. I want you to explain why — if I am or why I'm wrong. Is that there are potentially dozens of remedial plans. And there are hundreds of possible plans for a state. And every plan will hurt someone. And if one district in a state is changed, suddenly you open the door to every legislator and every Congressman from every other district challenging the plan. That strikes me as a big shift in the direction of taking power from the legislature and turning it over to the judges as to what kind of districting plan you're going to have and a mess to boot. That's what's worrying me. And I think you're right to be worried about it. Well, I knew you thought I would be. I'm going to tell you why. But I do think there are a couple of responses to that. And we do normally rely in that instance on the State to be the principal defender. But when the State's not there, what this Court recognized in Hollingsworth is often that means that the bill goes undefended. And that's not something that concerns the Court. Now, the reason why we have to be very careful about legislators and why choosing their own, I think as Plaintiff's counsel said, we don't usually let legislators choose their own voters. And there's good reason for that. That's not the way the system's supposed to work. And I do think it would have quite expansive effects. It's not clear to us there's a huge difference between this kind of line drawing and a challenge, for example, that a legislator might seek to appeal the relocation of a base or a university in his or her district on the grounds that that would radically change the number of Republican or Democratic voters in the district. Do you think Meese is – I'm sorry. I was just going to say that we think Meese is very different because Meese is not about choosing the voters in the district. It's about – we're not saying that you don't have an injury – Article III harm from a harm to reelection. We're saying that you don't have an interest in vindicating that right through a – through choosing the voters in your district. I'm sorry. Kagan. Kagan. I guess I find this a little bit harder than you just suggested because this is not Representative Forbes saying I want to choose exactly the set of voters that's going to increase my own electoral chances. This is Representative Forbes saying, look, there's been an act of the legislature and the act of the legislature has given me a certain set of voters, and why don't I have a legally cognizable interest in relying on that legislative judgment when some court has taken it away? Your Honor, I think it's for the same reason that this Court rejected that idea in Hayes itself. I think there isn't a cognizable interest among the voters or among the candidates in just seeing that a lawfully legislated districting plan is enacted. Otherwise, I think every voter in the state would have standing because the legislature said you should be in this district, you should have a fair opportunity to vote. But that's not the direction the Court has gone. And I do think that the combination of viewing the office as one that the office holder gets to choose the constituents and the potentially broad impact of that is one that should give this Court some pause. And particularly, again, just to pick up on what Plaintiff's Counsel, Mr. Elias, was saying, I think particularly in a situation where you have a State statute and this Court's observation in Hollingsworth, it would be quite unusual, I think, to find standing here. If I could switch over to the merits very quickly, a couple of points. I wanted to start with the observations of Justice Kennedy and Justice Kagan on the standard that Mr. Carvin has put forth, which as I understand it is basically the district is okay even if based on race as long as it could have been drawn on the basis of politics or would have been. We think that really flies in the face of the Shaw and Miller line of cases, that what those cases are about at core are two principal things, that you can't use race as a proxy and you can't sort voters on the basis of race. And when you do that, it is not a defense to say, well, I could have done the same thing on the basis of politics. You can send it back. If the legislature, in fact, does the same thing, taking race out of the equation, then fine. The injury that the Shaw line of cases was designed to get at is eliminated. It is precisely the sorting. And so I think the would-have or could-have test that Mr. Carvin has put forward is really quite at odds with this Court's jurisprudence. Roberts. But, I mean, people objected to some extent that Cromartie cut back on Shaw and Miller as well. And, again, I just — I at least would feel on much more solid ground if the plaintiffs had been put to the test of saying, show us. They say, this isn't about partisanship. This is about race. Okay. Show us. You draw the district that would protect the partisanship interest that's going to be different. And yet the lower court did not subject them to that inquiry. So, Your Honor, we think Cromartie is a very important case, but it actually is quite the exact opposite of the situation here. We think Cromartie is the situation in which the legislative — there was direct and substantial evidence that the legislature acted on the basis of politics, and statistics were put forward that said it's equally explained by race. And what this Court said, and we think it was sensible, is there's basically a thumb on the scale for politics at that point to give the State legislatures their room. But in a situation like this, where there's direct and substantial evidence that race was at issue, that same evidence that it's equally consistent with politics just doesn't cut it. Well, okay, there's evidence that race was at issue. I will give you a chance to answer the question I asked each of the others. I wouldn't want to deprive you of that opportunity. But you're looking to see whether race was the motive. What do you do if, as I said, 10 say yes, 10 say something else, and 80 don't say anything? How can you say that the motive of the legislature was this or that? So, Your Honor, I think it's obviously a difficult question, but I would say two things on that. First is, this Court's cases have been fairly unanimous in looking to the intent of the drafter. That's what they look to, for example, in Bush v. Vera. And in Alabama, this Court had a policy, and it didn't look to see whether each of the legislators individually had embraced that policy. That was something that the Court accepted. So I think there's a long line of case law going that way. And second, of course, it's not solely the intent of the drafter here. There are objective indicators, which this Court has indicated in both Shaw and Miller, are extremely important. Things the Court looks to, the traditional redistricting factors, such as contiguity, compactness, are counties being split, that reinforce that kind of intent. And those are things that are open, that are part of the plan that was enacted by all the legislators. And whether the drafter or other members of the legislature say race was our first consideration, and by that, what we mean is that we have to take race into account under the Voting Rights Act, and that's what we've done. With that, what would be the situation? What would be the result there? So, Your Honor, I don't think that that necessarily results in strict scrutiny. What this Court has said over and over is that the race must predominate. The mere intentional or consciousness of race or even the intentional use of race is not sufficient. And we think that makes sense, because as the Court has said, the redistrictors are always conscious of race and always aware of race, and that the State legislatures need room and need room to maneuver. And so the mere fact that you're conscious of race or even that you intentionally use race is not sufficient by itself to have strict scrutiny. Roberts. Thank you, counsel. Mr. Carvin, you have four minutes remaining. I'd like to begin with Justice Kagan's questions. We've heard a constant theme that if it was done because of race, a post hoc political explanation doesn't justify it. I fully agree with that. We have a mixed motive case here. That's what the district court said, race, politics, and incumbency protection. And the only reason that race was, quote, ranked higher was because he said that it was a Federal mandate under the Supremacy Clause. So if that's not a justification, then they committed legal error. You turn to 33A. Why was politics and incumbency subordinate? They told you, because that, quote, goal was permissive and subordinate to the mandatory criteria of compliance with the VRA. Now, they said that they implemented it by not reducing the benchmark VBAP, but that had nothing to do with the rank ordering of VRA over these other things. To get to your question, if two — I take the point, Mr. Carvin, but isn't that really exactly what we've confronted in Alabama, which is, you know, the number one priority was the VRA, but then it turned out that they had misunderstood the VIA, so it turned out that the number one priority was the racial quota, which had nothing to do with the way the VRA is really supposed to operate. That's fine, and that goes to narrow tailoring. But what we're trying to figure out here is whether or not there's a prima facie case. Now, assume with me that in 30 of the districts in Alabama, race was completely coextensive. They didn't assert politics, but with county lines. Would you ever say that race predominated over something or subordinated something when they're entirely coextensive? Let's take it out of the racial context. Compactness is number two, county lines are number three. You draw a nice compact district that complies with county lines. No one in their right mind would say compactness predominated over county lines because the same result was ordained by these two motives. And you can search this opinion for any finding that race was inconsistent with or subordinated in competency protection or politics, and you won't find it. Therefore, they haven't made their basic burden of showing that traditional districting principles were subordinated, nor their specific Cromartie II burden of showing it was subordinated to race rather than politics. The only evidence that they've even tried to come up with at the last minute is Joint Appendix 439. This is the VTD analysis done by McDonald. It is undisputed that it has exactly the same flaws that this Court rejected as a matter of law in Cromartie II. Why? Because the racial effect is identical to the political effect. He made a big deal about the fact that there was a 16.5 percent gap between the VTDs in District 3 and those outside of District 3 in terms of race. But what his own index shows on JA 439 is there was also a 16 percent gap in Democratic percentages. So it's exactly the same flaw that was at issue in Cromartie II is here. So unless this Court is prepared to allow district courts to engage in naked defiance of the plain language and holding of Cromartie II, this case needs to be reversed. As to your direct evidence point, Justice Kagan, what was the direct evidence in Cromartie II? Partisan and racial balance. The Court said, as clear as possible, since he said partisanship and race, it says little or nothing about the relative predominance. What do we have here? Incumbency protection, politics, and race. Therefore, the direct evidence says little or nothing about the relative predominance. What you need to do is to show that they could have accomplished their legitimate political objectives in some other way. As to standing, I've heard the slogan repeated by all of my opponents, voters choose representatives, not vice versa. That's a lovely slogan. But the relevant point here is that State legislatures choose which districts those voters go into, not the Federal Judiciary. If, as you must assume, the Federal Judiciary has exceeded its proper role and created a system which dramatically hurts the incumbents who were designed to be protected by this Thank you, counsel. The case is submitted.